<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHARLES DEREK HOLMES,** | **Civil Action No. 13-765** |
| *Plaintiff,* | |
| v. | **OPINION** |
| **NEWARK PUBLIC SCHOOLS, et al.,** | |
| *Defendants.* | |

**THIS MATTER** comes before the Court on Defendants Newark Public Schools ("NPS"), Nicholas Salardino, Atiba Buckman, Mitchell Center, Gerald Samuels, and Genevieve Murray ("Individual Defendants") (collectively, "Defendants") motion for summary judgment against <u>pro se</u> Plaintiff Charles Holmes ("Mr. Holmes").  Dkt. No. 93.  For the reasons set forth below, the motion is **GRANTED**.

## I.  BACKGROUND

In this employment suit, Mr. Holmes, a teacher, claims that over an eight-year period the school system and his supervisors reassigned him to different schools, gave him low evaluations, and cited him for misconduct because of his race, age, gender, and for lodging complaints with the EEOC.

Mr. Holmes is an African-American man who was born in 1958.  R. 56 Statement of Material Facts ("R.56 Stmt.") ¶ 1, Dkt. No. 93-1.[1]  He holds teaching certificates for elementary

---

[1] Unless identified otherwise, the following facts are taken from Defendants' Rule 56.1 Statement of Material Facts.  Mr. Holmes did not file a responsive statement or provide a similar written submission containing contradictory facts.  In such situations, the District applies a rule of lenience for <u>pro se</u> litigants: "Where a nonmoving <u>pro se</u> litigant fails to file a responsive Local Civil Rule

school, early childhood education for pre-K through third grade, and an earth science certification for grades four through eight.  Id. ¶ 32.

### A.  Fifteenth Avenue School (2005-2009)

In 2005, NPS hired Mr. Holmes to teach kindergarten at Fifteenth Avenue School, where Defendant Malcolm Outlaw was Vice Principal.  Id. ¶¶ 27, 39, 40.  Mr. Holmes was supervised in the day-to-day activities of his employment by the Principal of the school, Ms. Kornegay.  Id. ¶¶ 33, 39.  Ms. Kornegay, like all NPS principals, was responsible for observing the teachers and making appropriate class assignments within the school.  See id. ¶ 34.  In April 2006, Ms. Kornegay completed a lesson plan observation of Mr. Holmes and rated his performance as "proficient."  Id. ¶ 40.  In May 2006, Vice Principal Outlaw completed Mr. Holmes's Annual Teacher Evaluation Report and rated his performance "basic."  Id. ¶ 41.  The following month, Vice Principal Outlaw cited Mr. Holmes for not submitting lesson plan books in a timely manner and for failing to read certain assigned professional development books.  Id. ¶ 43.  Mr. Holmes never filed any formal complaint with NPS about Vice Principal Outlaw's rating.  Id.¶ 42.

Mr. Holmes stayed at Fifteenth Avenue School for the next two years.  Id. ¶¶ 45, 53.  Over the course of the 2006-07 year, Ms. Kornegay cited Mr. Holmes for several other issues, including failure to timely file a substitute folder and lesson plan, a verbal warning for neglect of duty, and

---

56.1 statement of undisputed material facts, a court may draw the relevant facts underlying the claims from available sources such as the complaint, deposition testimony, the moving litigant's Local Civil Rule 56.1 statement of undisputed material facts and supporting exhibits."  Athill v. Speziale, No. 06-4941, 2009 WL 1874194, at *2 (D.N.J. June 30, 2009) (citing Jordan v. Allgroup Wheaton, 218 F. Supp. 2d 643, 646 n. 2 (D.N.J. 2002), aff'd 95 F. App'x 462 (3d Cir. 2004)).  As such, the Court will take the allegations in Defendants' Statement that have evidentiary support as admitted unless the Court can reasonably identify a material counter-fact from the available sources.

excessive absenteeism.  Id. ¶¶ 48, 49.  Ms. Kornegay also rated Mr. Holmes as "unsatisfactory" after a March 2007 observation and "basic" for his annual end of year evaluation.  Id. ¶¶ 50-51.

Over the next year, Defendant Gerald Samuels, Jr., an African American man, replaced Ms. Kornegay as Principal.  Id. ¶ 53; Pl.'s Dep. 108:11.  Principal Samuels, like his predecessor, cited Mr. Holmes for failing to maintain at least three days of substitute plans in the main office and for excessive absenteeism, but ultimately recommended him for tenure.  Id. ¶¶ 57, 58; Pl.'s Dep. 44:12-15.  Vice Principal Outlaw also cited Mr. Holmes for failing to teach his kindergarten class.  Id. ¶ 56.  At the end of the year, however, Mr. Holmes was granted tenure.  Pl.'s Dep. 57:1-3.

The following year, the 2008-09 school year, Principal Samuels was replaced by Mr. Outlaw, who changed Mr. Holmes's teaching assignment from kindergarten to third grade.  Id. ¶¶ 60-61.  The contract governing Holmes' employment, the Newark Teacher's Union and NPS Collective Bargaining Agreement ("CBA"), does not guarantee that he will be assigned to teach at one location and in the same grade level throughout his tenure with NPS.  Id. ¶ 37.  School assignments are not based upon a system of seniority; they are made at the discretion of the superintendent due to changed conditions and student need.  Id. ¶ 38.  In a letter to Mr. Holmes, Principal Outlaw explained that the change in assignment occurred because of staff restructuring school needs.  Kumar-Thompson Cert. Ex. 32, Dkt. No. 93-3.  The new assignment—as with all later reassignments and transfers—did not result in a change in compensation or benefits, though Mr. Holmes maintains that teaching the two grades levels was "different," and involved learning different course material.  R.56 Stmt. ¶ 64; Pl.'s Dep. 55:8-10, Kumar-Thompson Cert. Ex. 1.

Principal Outlaw cited Mr. Holmes for several more infractions over that year.  R.56 Stmt. ¶ 65.  Specifically, he cited Mr. Holmes for failing to display student work, failure to submit lesson

plans in the areas of literacy and science, not keeping up with the curriculum and pacing guides, not providing evidence of students' writing progress, losing instruction time by not picking up students from playground on time, not submitting lesson plans and other district assessments and reports in a timely manner, and failing to attend grade level meetings.  Id.

Sometime during the school year, though the date is no clear from the record, Mr. Holmes was temporarily removed from his teaching duties after a student complained that Mr. Holmes abused him.  Pl.'s Dep. 59:11-60:11.  Mr. Holmes was reinstated after the State Division of Youth & Family Services deemed the charges unfounded.   Id.  Mr. Holmes testified in his deposition that he believes Principal Outlaw encouraged the student to make the false accusation because Principal Outlaw said "you didn't see that coming" after the charges were filed.  Id. 59:24-60:1.

On January 23, 2009, Mr. Holmes wrote a letter to the Equal Opportunity Commission ("EEOC"), alleging that his transfer and treatment by Principal Outlaw constituted discrimination on the basis of race, gender, and age.  Id. ¶ 15.  In the letter, Mr. Holmes alleges in essence that the transfer was discriminatory because he was the most experienced Kindergarten teacher and the other two Kindergarten teachers that remained were both white women.  See Kumar-Thompson Cert. Ex. 9 ("January 2009 EEOC Letter").  Mr. Holmes, however, never filed any grievance with NPS' affirmative action officer, despite being aware of NPS' anti-harassment policy and grievance procedures.  R.56 Stmt. ¶ 14.  On March 28, 2009, Mr. Holmes sent a second letter to the EEOC to include allegations that Principal Outlaw was supervising Mr. Holmes' class too often.  Id. ¶ 16.  A few days later, Mr. Holmes filed a complaint with the EEOC against Principal Outlaw specifically alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967.  Id. ¶ 19.

In May 2009, in light of these letters, Mr. Holmes met with NPS' assistant superintendent to discuss the allegations.  Id. ¶ 67.  Mr. Holmes was notified by letter dated June 1, 2009 that he would be transferred to Camden Street Elementary School for the 2009-10 school year to teach first grade.  Id. ¶¶ 67-68, Pl.'s Dep. 72:5-73:19.

**B.  Camden Street Elementary School (2009)**

During his time at Camden Street Elementary School, Mr. Holmes received a number of citations from the vice principal, Defendant Nicholas Salardino.  R.56 Stmt. ¶¶ 69, 71-78.  From September 2009 to November 2009, Vice Principal Salardino cited Mr. Holmes for deficient instruction of students, gave Mr. Holmes a verbal warning for neglect of duty for failing to have complete lesson plans submitted to the administration, and wrote memoranda to Mr. Holmes providing suggestions on how to improve classroom management and explaining that Mr. Holmes failed to submit student assessment reports and failed to have all of his students turn in permission slips for a scheduled field trip.  Id. ¶¶ 71-78.  Mr. Holmes testified that he believes Vice Principal Salardino did not fairly evaluate his classroom skills, but he admits that he did not submit complete lesson plans (and continued to submit late materials thereafter), did not turn in the student assessments, and did not receive all permission slips.  See id. ¶¶ 72, 76, 78.

In the middle of these events, in October 2009, Mr. Holmes filed a lawsuit against Principal Outlaw and NPS, but not Vice Principal Salardino, in New Jersey State Superior Court.  Id. ¶ 82.  The complaint reasserted the same retaliation claims arising from his time at Fifteenth Avenue School as those asserted in his charges filed with the EEOC.  Id.  The case was eventually dismissed with prejudice when Mr. Holmes did not oppose a motion to dismiss.  Id.

### C.  Ivy Hill Elementary School (2009 to 2010)

Shortly thereafter, on November 20, 2009, Mr. Holmes was transferred to teach seventh grade science at Ivy Hill Elementary School.  Id. ¶ 79.  In response to the transfer, Mr. Holmes filed a petition for a contested transfer with the Public Employment Relations Commission.  Id. ¶ 80.  Mr. Holmes alleged that he was transferred "[b]ecause I began to insist that Mr. Salardino treat me with respect and dignity . . . ."  Kumar-Thompson Cert. Ex. 43.  However, the authority to transfer teachers to different schools belongs to the Chief Administrator of the School, not Vice Principal Salardino.  See R.56 Stmt. ¶ 81.

During his tenure at Ivy Hill, Mr. Holmes missed work for large periods of time.  See id. ¶¶ 91-92.  He took several sick days during the year and took a long leave of absence from December 2009 until June 2010.  Id. ¶ 91.  NPS approved one month of that period for covered leave under the Family Medical Leave Act, but informed him that the remainder of the days missed constituted "an unauthorized leave of absence . . . ."  Kumar-Thompson Cert. Ex. 46.  Ultimately, Mr. Holmes only taught his seventh grade class for a few days that school year.  R.56 Stmt. ¶ 92.

At the end of that school year, Mr. Holmes filed two more letters with the EEOC alleging that Vice Principal Salardino discriminated against him, as evidenced by the citations and transfer from Camden Street Elementary School to Ivy Hill.  Id. ¶¶ 18, 84; see generally Kumar-Thompson Cert. Exs. 12-13.

### D.  Speedway Academies (2010 to 2013)

Mr. Holmes was then transferred to Speedway Academies to teach third grade.  R.56 Stmt. ¶ 93.  Principal Samuels, who was the principal at Fifteenth Avenue School during Mr. Holmes' tenure there, was now the principal at Speedway Academies.  Id. ¶ 95.

Throughout the year, year Mr. Holmes received numerous memoranda from Principal Samuels regarding his failure to complete student progress reports, to submit substitute and lesson plans in a timely manner, to enforce school rules for uniform compliance, to send his students to mandated computer lab training, tardiness to work, missing meetings, and other performance issues with his teaching and following the procedures in place for the students and teachers at Speedway Academies.  Id. ¶ 98.

In February 2011, Mr. Holmes sent a final letter to the EEOC, in which he complained about his transfer to Speedway Academies from Ivy Hill Elementary and about Principal Samuel's issuances of various warnings about his teaching duties.  Id. ¶ 20.

In April, Principal Samuels placed Mr. Holmes on a teacher observation intervention plan due to his numerous performance issues.  Id. ¶ 105.  At the end of the school year, Mr. Holmes received an overall "unsatisfactory" rating from Principal Samuels on his annual performance evaluation.  Id. ¶ 110.

Then, by letter dated May 2, 2011, the EEOC notified Mr. Holmes of his right to sue within 90 days under Title VII of the Civil Rights Act of 1964 based upon the many charges he filed over the years.  Id. ¶ 21.  He did not bring any claims under Title VII within 90 days.  Id. ¶ 22.

Around the same time, Mr. Holmes began having issues with Defendant Genevieve Murray, an NPS liaison for the Children's Literacy Initiative ("CLI") Program at Speedway Academies.  See id. ¶¶ 161-62.  The CLI program involved an outside grant consultant who met with and instructed NPS teachers on ways to improve student literacy rates.  Id. ¶ 99.  Mr. Holmes was assigned to a particular CLI instructor, but asked to change after the instructor requested that Mr. Holmes extend one of their meeting that was running long into his lunch period.  Id. ¶ 164.  Mr. Holmes had failed to meet with the instructor once before and did not attend a subsequently

scheduled meeting.  Id. ¶¶ 166, 168.  Principal Samuels accordingly removed him from the program.  Id. ¶ 169.  Five days later, however, he received an e-mail from Ms. Murray advising him of a mandatory meeting at the Newark CLI office for all teachers participating in the CLI program.  Id. ¶ 170; Kumar-Thompson Cert. Ex. 74.  Several hours after sending the e-mail, Principal Samuels informed Ms. Murray that Mr. Holmes was no longer involved in the program, but there is no indication that Ms. Murray ever sent a follow-up e-mail to Mr. Holmes excusing him from attending.  See R.56 Stmt.  ¶ 171; Kumar-Thompson Cert. Ex. 74.  When Mr. Holmes showed up at the meeting, Ms. Murray told him to return to school and walked him out of the building.  See R.56 Stmt. ¶ 172; Pl.'s Dep. 336:3-13.  Mr. Holmes testified that he was embarrassed because other teachers at the meeting saw the exchange.  See Pl.'s Dep. 336:3-339:8.

On August 2, 2011, Mr. Holmes filed the instant law suit in State Court against NPS.  Notice of Removal Ex. A, Compl., Dkt. No. 1-1.  The complaint is somewhat disjointed but appears to assert claims for (1) discrimination on account of race, gender, and age under NJLAD; (2) retaliation under NJLAD for his multiple filings alleging discrimination, including filing the lawsuit in the New Jersey Superior Court in 2008 and his submissions to the EEOC beginning in April 2010; and (3) intentional infliction of emotional distress.  In support of the discrimination and retaliation claims, he points to the school transfers, warnings he received for not completing certain tasks, poor performance ratings, removal from the CLI program, and inquiries that were made into his abuse of a student.  Id. at 2-3.  He did not assert any claims under Title VII.

The following school year, the 2011-12 year, Mr. Holmes remained at Speedway Academies but was assigned to teach pre-kindergarten, again a change that he did not want because the classes were "different."  Id. ¶¶ 112-13.  Principal Samuels continued to cite Mr. Holmes three times that year for his continued non-submission of lesson plans.  Id. ¶ 115.  Principal Samuels

also sent Mr. Holmes two memoranda discussing Mr. Holmes' contact with this students.  The first, on December 6, 2011, told Mr. Holmes not to give hugs to his students or let them sit on his lap.  Id. ¶ 116.  The second, on January 28, 2012, advised Mr. Holmes that two staff members reported seeing him with students sitting on his lap and between his legs.  Id. ¶ 118.  Mr. Holmes admits that he hugs the students and that they may sit on his knee (though not his lap), but he denies that the specific reported incidents occurred.  Id. ¶ 116; Pl.'s Dep. 183:6-14, 184:10-13.  Mr. Holmes did not face any discipline as a result of the reports.  R.56 Stmt. ¶ 120.  At the end of the 2011-12 school year, Holmes received an "unsatisfactory" evaluation rating from Principal Samuels.  Id. ¶ 121.

For the 2012-13 school year, Mr. Holmes remained at Speedway Academies teaching pre-kindergarten.  Id. ¶ 123.  Defendant Atiba Buckman was hired from outside the District to become the new principal, replacing Mr. Samuels.  Id. ¶¶ 124-25.  Mr. Holmes never interacted with Principal Buckman before she was hired and does now know if she had been aware of his complaints against his prior supervisors.  Id. ¶¶ 126-27; Pl.'s Dep. 202:10-16.

In September, Principal Buckman issued two memoranda to Mr. Holmes.  The first memorandum cited Mr. Holmes for failing to notice that a child was sitting under a table and crying.  R.56 Stmt. ¶ 132.  Mr. Holmes admits that the child was under the table but that the child was crying because Principal Buckman scared him.  See Pl.'s Dep. 205:15-21.  The second cited Mr. Holmes for failing to submit certain forms on time.  R.56 Stmt. ¶ 135.  Mr. Holmes testified that Principal Buckman began observing his classroom several times a day.  Id. ¶ 131.

In October, Principal Buckman held a staff development meeting with the staff, where she explained that she was willing to give teachers unfavorable rating regardless of the length of the time they had been employed.  Id. ¶ 129.  Mr. Holmes interpreted the statement as a threat to him,

though he denies that she made specific reference to him.  See Pl.'s Dep. 203:6-204:9.  Mr. Holmes began sending e-mails to the staff warning them not to trust Principal Buckman.  Id. 203:4-11.

On November 9, 2012, Mr. Holmes send an e-mail titled "A Better Way" from his work computer while school was in session to roughly 40 teachers.  Id. ¶ 141; Kumar-Thompson Cert. Ex. 63.  In the e-mail and attached letter, Mr. Holmes stated that "the administration feels that they can do whatever they want without fear of consequences" and recommended that Speedway Academies become a charter school.  Kumar-Thompson Cert. Ex. 63 at 1.  The following week, Principal Buckman charged Mr. Holmes with violating the NPS' use of internet policy and for neglect of duty.  R.56 Stmt. ¶ 137.   NPS Policy concerning email internet usage during school hours prohibits teachers from using the email system for any purpose other than the exchange of academic information and furtherance of Newark Public School's mission and goals.  Id. ¶ 140. On December 4, 2012, a disciplinary hearing was conducted by the Labor Relations Office with Holmes' union representative in attendance.  Id. ¶ 144.  Mr. Holmes was disciplined with a letter of reprimand, but he did not suffer a decrease in salary or lose any benefits.  Id. ¶¶ 148-49.

On January 9, 2013, Mr. Holmes filed an Amended Complaint incorporating the original allegations against NPS and adding additional claims against the Individual Defendants: Principal Samuels, Vice Principal Salardino, Principal Buckman, Ms. Murray, and Assistant Superintendent Mitchell Center, who allegedly permitted the continued harassment.  Notice of Removal Ex. H, Amended Complaint ("AC") at 1, 4, Dkt. No. 1-2.[2]  The Amended Complaint adds a Title VII claim, as well as claims against the Individual Defendants for "retaliation, discrimination, creating a hostile work environment, harassment, intentional infliction of emotional distress, [and] aiding

---

[2] The Amended Complaint is not divided into numbered paragraphs and the pages are inconsistently numbered, so citations to the document correspond to the actual PDF page numbers.

and abetting in being the vehicles through which [NPS] continued and continues their campaign of retaliation and discrimination against Mr. Holmes." Id. at 4.[3]  The Amended Complaint also asserts claims for (1) defamation against Mr. Samuels based on his alleged accusations that Mr. Holmes committed sexual misconduct; and (2) violations of the First and Fourteenth Amendment against Ms. Buckman. Id. at 2-5.

Defendants removed the case to federal court in February 2013.  After the parties engaged in discovery, Defendants filed the instant motion for summary judgment in September 2015.  Dkt. No. 93.

## II.   LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  All facts and inferences must be construed in the light most favorable to the non-moving party.  Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

---

[3] Because Title VII does not include age, the Court assumes Mr. Holmes's age discrimination claim only falls under NJLAD.  See Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 586 (2004) ("Congress chose not to include age within discrimination forbidden by Title VII of the Civil Rights Act of 1964 . . . .").

III.   ANALYSIS

   A.  Title VII Claims

Defendants argue that Mr. Holmes' Title VII claims for discrimination, retaliation, and hostile work environment should be dismissed because Mr. Holmes failed to exhaust his administrative remedies.  The Court agrees. [4]

A plaintiff filing claims under Title VII must first exhaust his or her administrative remedies with the EEOC before seeking judicial review.  See Purvis-Chapman v. Silverstein, No. 14-4252, 2016 WL 1261208, at *5 (D.N.J. Mar. 31, 2016) (citing 42 U.S.C. § 2000e-5(e)(1)); see also Burgh v. Borough Council of Borough of Montrose, 251 F.3d 465, 469-70 (3d Cir. 2001) (discussing administrative remedy requirements under Title VII).  Specifically, a charge of unlawful employment practices must be filed with the EEOC within 180 days of the occurrence of the alleged unlawful employment practice, and the plaintiff must bring a private action within 90 days of receiving a right-to-sue letter from the EEOC.  Burgh, 251 F.3d at 469.  This timing scheme, which is treated as a statute of limitations, is "strictly construed," and "in the absence of some equitable basis for tolling, a civil suit filed even one day late is time barred and may be dismissed."  Id. at 470 (internal citation omitted).

Here, Mr. Holmes did not bring this suit within 90 days of receiving his right to sue letter. On May 2, 2011, the EEOC sent Mr. Holmes a right to sue letter based on the myriad complaints he filed.  Mr. Holmes filed the initial complaint on August 2, 2011, but that complaint did not contain Title VII claims.  Mr. Holmes did not amend his complaint to include the Title VII claims

---

[4] It is unclear whether Mr. Holmes also asserts the Title VII claims against the individual Supervisor Defendants, in addition to NPS.  To the extent he does, those claims are dismissed because individual employees cannot be held liable under Title VII.  Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1078 (3d Cir. 1996) ("Congress did not intend to hold individual employees liable under Title VII.").

until January 9, 2013, well beyond the 90-day time limit.  Id. ¶ 22.  The Title VII allegations asserted before the EEOC are therefore time-barred.

Moreover, any acts that occurred after he filed the EEOC complaint will also be dismissed because he failed to file those charges with the EEOC first before asserting them here.  Mr. Holmes alleges that, after May 2, 2011, a number of subsequent incidents constituted unlawful practices, including, for example, receiving low evaluation ratings, the reassignment to teach pre-kindergarten, the issues about contact with students, and Principal Buckman's observations to his Pre-Kindergarten classroom, etc.  But Mr. Holmes did not raise these claims with the EEOC before including them in the Amended Complaint.  Nor can the Court discern any basis to conclude that the strict filing deadline should be tolled on equitable grounds.  Accordingly, the Court finds that Mr. Holmes failed to exhaust any claims predicated on incidents that arose after May 2, 2011, and the time for such exhaustion has long since expired.

The Court will dismiss Mr. Holmes's Title VII claims with prejudice.  Because Mr. Holmes is out of time to exhaust his administrative remedies before the EEOC, his Title VII claims are barred.  Given this deficiency, any amendment would be futile.

### B.  Discrimination and Retaliation under NJLAD

Defendants next argue that the NJLAD claims fail because Mr. Holmes did not establish prima facie disparate treatment or retaliation claims.  The Court agrees.[5]

---

[5] Assuming Mr. Holmes's Title VII claims were not time-barred, they would fail on the merits for the same reasons as the NJLAD claims.  See Cortes v. Univ. of Med. & Dentistry of New Jersey, 391 F. Supp. 2d 298, 311 (D.N.J. 2005) ("The analysis which is applied in Title VII claims is equally applicable to actions brought under other civil rights statutes, and thus the Title VII analysis applies to claims brought under the NJLAD as well.") (internal citations omitted).

1. Burden-Shifting Framework for NJLAD Discrimination and Retaliation Claims

The New Jersey Supreme court has adopted the <u>McDonnell Douglas</u> burden-shifting framework for NJLAD claims. <u>Battaglia v. United Parcel Serv., Inc.</u>, 214 N.J. 518, 546, 70 A.3d 602, 619 (N.J. 2013) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)).

The <u>McDonnell Douglas</u> standard involves three steps, the first of which requires Mr. Holmes to prove a prima facie case of unlawful employment practices by a preponderance of the evidence. <u>See id.</u> (discussing retaliation claims under NJLAD); <u>Bergen Commercial Bank v. Sisler</u>, 157 N.J. 188, 210 (1999) (discussing discrimination claims under NJLAD). A prima facie discrimination claim requires the plaintiff to prove that he or she (1) is a member of a protected class; (2) was qualified for the position he or she sought to attain or retain; (3) suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008) (internal citations omitted). A prima facie retaliation claim requires the plaintiff to prove (1) the employee engaged in a protected activity known to the employer; (2) the employee was subjected to an adverse employment decision; (3) there is a causal link between the protected activity and the adverse employment action; and (4) that the original complaint was both reasonable and made in good faith. <u>Battaglia</u>, 214 N.J. at 547 (internal citations omitted).

If a plaintiff establishes a prima facie claim, then an inference of unlawful motive arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory or non–retaliatory reasons for the adverse employment action. <u>Makky</u>, 541 F.3d at 214 (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506-07 (1993)). If the defendant does so, the inference drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely pretext for the unlawful conduct. <u>Makky</u>, 541 F.3d at 214 (citing <u>St. Mary's</u>, 509 U.S. at 507-08).

### 2. Mr. Holmes Discrimination and Retaliation Claims

Here, Mr. Holmes failed to meet the first step.  Specifically, he cannot establish an adverse employment action or a link between the protected characteristic or activity and the adverse action.

The Third Circuit defines an "adverse employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152-53 (3d Cir. 1999) (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  In other words, "[i]f an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." Id. at 153.

In the retaliation context, the action must be "materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Roa v. Roa, 200 N.J. 555, 575, 985 A.2d 1225, 1236 (2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61, 68 (2006)).[6]  But the harm must be "significant," not merely "trivial." Id. "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id. (internal citation omitted).

Mr. Holmes points to six incidences as adverse actions: (1) transfers to different grade levels in different school locations; (2) issuance of performance deficiency memorandums and poor performance evaluations; (3) the written reprimand for misuse of NPS' email system and

---

[6] In other words, retaliation and discrimination claims use slightly different standards to determine whether an employment action was adverse.  See Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006). "The anti-retaliation provision, unlike the [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment . . . The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. (internal citation and quotation marks omitted).

neglect of duty; (4) heightened supervision from several supervisors over the years; (5) written memoranda instructing Mr. Holmes to refrain from having students sit on his lap; and (6) removal from the CLI Program in an embarrassing fashion.[7]

These events do not qualify as adverse employment actions. First, the transfers are not sufficient. The transfers did not involve a demotion in form or substance, and the only harm he associates with the moves—i.e., having to learn new course materials—is trivial at best. Although the curricula are not the same from grade to grade, Mr. Holmes has provided no reason to believe that the various classes are somehow intrinsically different or significantly more difficult to teach. See Swangin v. Pub. Sch. of Edison Twp., No. 03-4058, 2007 WL 1302486, at *11 (D.N.J. Apr. 30, 2007) (finding no adverse action where guidance counselor was transferred within the district five times); Canale v. State, No. A-0104-12T2, 2013 WL 3762470, at *9 (N.J. Super. Ct. App. Div. July 19, 2013) ("A transfer involving no reduction in pay and no more than a minor change in working conditions will not do . . . ."); Koehl v. Newark Star Ledger, No. A-5248-02T2, 2004 WL 1630957, at *5 (N.J. Super. Ct. App. Div. July 10, 2004) (holding transfer not adverse because "nothing [is] peculiarly unique about one position that would distinguish it from another").[8] Moreover, the Collective Bargaining Agreement between the Newark Teacher's Union and NPS specifically discuss the possibility that teachers may be involuntarily transferred from school to school, so the decision to transfer Mr. Holmes was not out of line with standard procedures. See R.56 Stmt. Ex. 7 ("CBA") § 6.C.

---

[7] In the unverified complaint, Mr. Holmes also appears to allege that he was denied preparation periods and was required to hold detention without pay. See Compl. at 2. Neither party adduced any evidence concerning these allegations.

[8] Mr. Holmes's subjective view that teaching kindergarten was "slightly more fulfilling" than teaching other grades, Pl.'s Dep. 54:17-18, does not make the transfer actionable. See Schott v. State, No. A-2612-04T1, 2006 WL 1911375, at *9 (N.J. Super. Ct. App. Div. July 13, 2006) ("An employee's subjective feelings are irrelevant" to the adverse action inquiry.).

The performance evaluations, heightened supervision, and written reprimands do not qualify as adverse actions either.  Such occurrences, unaccompanied by a demotion or similar action, are insufficient.  See El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 160, 170 (App. Div. 2005) (finding no adverse action where plaintiff received "below standard" evaluation and was subject to supervisory observation); Weston v. Pennsylvania, 251 F.3d 420, 425 (3d Cir. 2001) (finding no adverse action where written reprimands did not effect a material change in terms of conditions of employment), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, (2006).  Aside from the evaluations, supervision, and reprimands themselves, Mr. Holmes's deposition testimony does not identify any other harms that flowed from these incidences.  He was not demoted, did not lose any authority or responsibilities, did not have his work schedule changed, was not denied any pay or promotion, and he does not identify any other definite consequences resulting from these events.  Mr. Holmes may not believe that the evaluations, supervision, or reprimand were warranted, but he has not provided any reason to find that they constituted tangible or material harms.

This is particularly true for the incidents involving the December 6, 2011 and January 28, 2012 memoranda instructing Mr. Holmes to refrain from have physical contact with students.  Mr. Holmes admits he would have physical contact with his students in a similar manner to that described in the memos; Principal Samuels sent the memoranda directly to him, and there is no indication that the memos were sent to anyone else; and the memoranda were warnings and did not lead to any subsequent penalty.  This does not constitute adverse action.

Finally, Mr. Holmes's removal from the CLI program was not an adverse action either.  He did not receive any monetary compensation for his participation in the program, nor was the program necessary for Mr. Holmes to perform his job.  R.56 Stmt. ¶ 174.  Mr. Holmes did receive

credits for professional development by participating in the CLI program, see Pl.'s Dep. 343:4-24, but there is no indication that the inability to receive the credits through the CLI program impacted Mr. Holmes' employment.   Moreover, Mr. Holmes's displeasure with the way he was asked to leave his final CLI meeting was a "petty slight," not an actionable incident.   See Moore, 461 F.3d at 346.

Ultimately, Mr. Holmes did not have any change in salary, benefits, or job responsibilities; received tenure; and is still employed as an NPS teacher.   Nothing in the record suggests that the trivial harms he points to constituted a significant change in employment status or would dissuade a reasonable worker from filing or supporting a charge of discrimination.   Accordingly, no adverse employment action occurred.

Mr. Holmes's deficiencies in proof do not end there.   The record also does not reveal any evidence from which a reasonably jury could find that these purported adverse actions were tied to any protected characteristic or conduct.

Mr. Holmes grounds his claims of discrimination and retaliation in unsupported, self-serving allegations.   For example, when asked why the transfers were improper, Mr. Holmes responded, "I felt that being transferred was just another form of harassment.   So each time that they transferred me, it was harassment, retaliation." Pl.'s Dep. 130:21-23.   Mr. Holmes then states that Mr. Samuels, who belongs to the same protected class as Mr. Holmes, "may have discriminated against me when he transferred me from kindergarten to third grade" but Mr. Holmes did not have any other evidence to support his theory.   Id. 109:6-8, 25 (emphasis added); see Dungee v. Ne. Foods, Inc., 940 F. Supp. 682, 688 (D.N.J. 1996) (finding inference of discrimination weakened where decision maker is a member of plaintiff's protected class).   Mr. Holmes also states that "it's possible" that the transfer to Ivy Hill Elementary occurred because he

accused Vice Principal Salardino of harassment.  Pl.'s Dep. 100:25-101:1.  When asked why the transfer from Ivy Hill Elementary to Speedway Academies occurred because of his race or gender, Mr. Holmes responded "I don't know."  Id. 133:8-16.  When asked how Mr. Holmes knew Ms. Murray purposefully failed to tell him not to attend the final CLI meeting, he responded, "I don't." Id. 341:9-13.

When asked to explain his age and gender discrimination claims, Mr. Holmes responded:

> A. [T]hey may have replaced me with a younger female teacher.
>
> Q. Who was that?
>
> A. I don't know.  I haven't gotten the information from the district yet.

Id. 101:24-102:3.  When asked what evidence supports his allegation that the infractions raised by Principal Samuels at Speedway Academies were mere fabrications, Mr. Holmes again stated, "I don't know.  That's my answer.  I don't know . . . [I]f that's his opinion then that's not a fabrication."  Id. 151:7-25, 152:5-6.  Finally, when asked to support his claim that Assistant Superintendent Mitchell Center knew about the other Defendants' actions, Mr. Holmes responded, "He should have been aware," but "I don't have any evidence at this time [that he was aware]." Id. 187:20-188:6.  Such "speculations, generalities, and gut feelings, however genuine, do not permit an inference of discrimination to be drawn."  Lane v. Sears Logistics Servs., Inc., No. 11-6157, 2014 WL 1301549, at *4 (D.N.J. Mar. 31, 2014).

He similarly provides no evidence that any of the actions were taken in retaliation for filing claims or bringing the lawsuit.  The only evidence suggesting retaliation is that some of the actions happened after those events.  There is no additional evidence—direct or circumstantial—to support his claim.  "The mere fact that [an adverse action] occurs subsequent to the lodging of a complaint is ordinarily insufficient to satisfy the plaintiff's burden of demonstrating a causal link between

the two events." Chambers v. Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, at *11 (D.N.J. May 5, 2006). Moreover, must of what Mr. Holmes characterizes as retaliation for his EEOC complaint and lawsuits first occurred before he filed those claims. He had already received low performance reviews, was transferred, received non-compliance memos, and was subject to observations from his supervisors. Accordingly, Mr. Homes has not demonstrated the required causal link between her EEOC and lawsuit complaints and Defendants' conduct.

Accordingly, Mr. Holmes has not satisfied his burden of establishing a prima facie case of discrimination or retaliation under NJLAD.

### C. Hostile Work Environment Claims Under NJLAD

Mr. Holmes's next NJLAD claim asserts that he was subject to a hostile work environment. To prove a claim for a hostile work environment, Mr. Holmes must show that (1) he is in a protected class; (2) he was subjected to conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment. Lopez v. Lopez, 997 F. Supp. 2d 256, 274 (D.N.J. 2014) (citing Victor v. State, 203 N.J. 383, 4 A.3d 126, 141 (2010)).

The same reasons that Mr. Holmes's discrimination and retaliation claims fail apply equally here. He cannot show that he was subjected to conduct that would not have occurred but for any protected status. As explained above, he does not identify any conduct or statements indicating that Defendants' treatment of him was premised on, or at all related to, his race, gender, age, or complaints of discrimination.

Moreover, he cannot show the requisite severe or pervasive conduct. The "sine qua non of a hostile work environment claim is a 'workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" <u>Fitzgerald v. Shore Mem'l Hosp.</u>, 92 F. Supp. 3d 214, 240 (D.N.J. 2015) (citing <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002)).  The conduct "must be extreme to amount to a change in the terms and conditions of employment." <u>Id.</u> (quotin <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)).

Here, taking all of the incidents together, no reasonable fact finder could find that Defendants' conduct impermissibly altered Mr. Holmes's condition of employment.  The issues Mr. Holmes identifies are merely run of the mill personality and administrative conflicts.  They fall short of the extreme environment necessary to establish a prima facie claim, particularly absent any objective evidence that the conduct was threatening, humiliating, or unreasonably interfered with Mr. Holmes's work performance.  <u>See</u> <u>Ivan v. Cty. of Middlesex</u>, 595 F. Supp. 2d 425, 451 (D.N.J. 2009) (explaining that hostile work environment claims require examination into totality of circumstances, including whether conduct was physically threatening, humiliating, or unreasonably interferes with employee's work performance).  Mr. Holmes' hostile work environment claims fails.

### D.  Individual Liability under NJLAD

Unlike federal law, NJLAD imposes individual liability, albeit through "aiding and abetting."  NJLAD makes it unlawful for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act." N.J.S.A. § 10:5-12(e); <u>see</u> <u>Cicchetti v. Morris Cnty. Sheriff's Office</u>, 194 N.J. 563, 947 A.2d 626, 645 (2008).

To hold an employee liable as an aider and abettor, Mr. Holmes must show: (1) the employer whom the defendant aided performed a wrongful act causing an injury; (2) the defendant was generally aware of his role as part of an overall illegal or tortious activity at the time that he

21

provided the assistance; and (3) the defendant knowingly and substantially assisted the principal

violation.  Cicchetti, 947 A.2d at 645 (citing Hurley v. Atlantic City Police Dep't, 174 F.3d 95,

127 (3d Cir. 1999)).

Here, Mr. Holmes has not established any underlying forbidden acts; therefore, the

individual Defendants cannot be liable as aiders and abettors.  The claim fails.

### E.  14th Amendment Claim

Mr. Holmes also asserts a claim under the Fourteenth Amendment, though the legal theory

is not entirely clear.  He added the claim to the Amended Complaint, and discusses it only one

time regarding his allegations against Principal Buckman.  See AC at 3.  He alleges that Principal

Buckman's "part in the campaign of retaliation" consisted of the citations she wrote for lack of

classroom management, low evaluation ratings of Mr. Holmes, frequent observation of his

classroom, and the institution of charges relating to Mr. Holmes's use of the e-mail system.  Id.

Because Mr. Holmes's Fourteenth Amendment claim is based on retaliation, it fails as a

matter of law.  Such employment retaliation claims are properly governed by Title VII and cannot

provide a basis for a constitutional claim.  See Hargrave v. Cty. of Atl., 262 F. Supp. 2d 393, 440

(D.N.J. 2003) (dismissing Fourteenth Amendment claim of retaliation for filing sexual harassment

complaint because "employment discrimination claims based on theories of unlawful retaliation

or disparate impact—claims which owe their existence to Title VII and are not recognized under

general constitutional principles—may not be pursued via § 1983.") (internal citation omitted).

The Fourteenth Amendment claim cannot proceed.[9]

---

[9] Unlike retaliation claims, a Fourteenth Amendment claim of discrimination is independent of a
statutory disparate treatment claim under Title VII and therefore may be permitted.  See Bair v.
City of Atl. City, 100 F. Supp. 2d 262, 266 (D.N.J. 2000).  To the extent Mr. Holmes's Amended
Complaint could be construed as asserting a race or gender discrimination claim, such a claim
would still fail.  "[A] claim of an Equal Protection violation requires proof that the appellants were

### F.  First Amendment Claim

Mr. Holmes also asserts a First Amendment claim against Ms. Buckman on the same grounds as the Fourteenth Amendment claim.  See AC at 3.  "To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred."  Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 466 (3d Cir. 2015) (internal citations omitted).

Defendants do not dispute that the Mr. Holmes engaged in protected activity when he filed the EEOC charge and instituted the lawsuits alleging discrimination.  Defs.' Br. at 28.  They do, however, dispute that they engaged in any retaliatory conduct.

Similar to the Title VII retaliation standard, "the key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights . . . .' The effect of the alleged conduct on the employee's freedom of speech 'need not be great in order to be actionable,' but it must be more than de minimis."  McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006).  "[C]ourts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts

---

treated differently than similarly-situated individuals because of their [membership in a protected class]."  Oliveira v. Twp. of Irvington, 41 F. App'x 555, 560 (3d Cir. 2002) (emphasis added). Aside from Mr. Holmes's conclusory testimony that he was discriminated against because of his race and gender, the record does not contain evidence sufficient for an equal protection claim to withstand summary judgment.  Id. (denying summary judgment on race discrimination claim where plaintiffs' "contentions are supported almost exclusively by their own testimony and affidavits").

were criticism, false accusations, or verbal reprimands." Id. (quoting Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003)).

Here, the alleged acts of retaliation fall into this category.  Throughout his tenure with NPS, Mr. Holmes received criticisms of his teaching performance and reprimands for failing to adhere to NPS policies or the expectations of the specific schools' supervisors.  While Mr. Holmes disputes that these criticisms and reprimands were warranted, he does not dispute that most, if not all, of the underlying events occurred.  The same result applies to the transfers.  Mr. Holmes failed to show that the transfers were anything more than neutral changes to a position that he subjectively deemed to be less desirable.  See Revell v. City of Jersey City, No. 06-3210, 2009 WL 3152110, at *6 (D.N.J. Sept. 28, 2009) (finding transfer not retaliation because plaintiff did not show that transfer was a detrimental change in position), aff'd, 394 F. App'x 903 (3d Cir. 2010).  Nor has he provided any evidence that the new positions were unreasonably inferior.  Certain transfers even returned Mr. Holmes back to the elementary school level classes that he preferred at the outset.  There is no indication that these issues would deter a person of ordinary firmness from filing complaints.  His allegations simply do not rise to the level of a retaliatory harassment claim under the First Amendment.

Even assuming that any of these acts constituted sufficient deterrents, Mr. Holmes also has not shown that any of the conduct was done for the purpose of retaliating against him.  As explained under the Title VII analysis above, aside from the fact that some of the acts occurred after he filed the EEOC and state court complaints, Mr. Holmes does not provide any competent evidence connecting the acts to the complaints.  The First Amendment retaliation claim fails.

### G.  State Law Tort Claims

Mr. Holmes also brings two tort claims against several of the Individual Defendants.  He asserts a claim for intentional infliction of emotional distress against Principal Samuels, Principal Buckman, and Assistant Superintendent Center.  He also asserts a defamation claim against Principal Samuels for issuing the memoranda about Mr. Holmes's contact with students.

Defendants argue that all tort claims are barred because Mr. Holmes did not comply with the notice requirements of the New Jersey Tort Claims Act ("NJTCA"), N.J.S.A. § 59:1-1 et seq. The Court agrees.

The NJTCA provides the procedures for asserting claims against public entities and public employees.  Hernandez v. City of Union City, 264 F. App'x 221, 224 (3d Cir. 2008) (citing N.J.S.A. § 59:8-3).  When asserting a state tort claim against a public entity or a public employee, a plaintiff must give notice of the claim within ninety days after the cause of action has accrued. See Id. (citing N.J.S.A. § 59:8-8).  This notice requirement applies to common law intentional and negligent conduct claims.  Velez v. City of Jersey City, 180 N.J. 284, 292-93 (2004).  The 90-day notice period may be extended by a court upon a finding of "sufficient reasons constituting extraordinary circumstances" for the failure to timely file, but only if the plaintiff files a late notice "within one year after the accrual of his claim."  N.J.S.A. § 59:8-9; see Hernandez, 264 F. App'x at 224.  Plaintiffs who do not comply with this requirement are "forever barred" from recovering on their claim.  See N.J.S.A. § 59:8-8.

Here, Mr. Holmes seeks to bring intentional tort claims against several public employees. As such, Mr. Holmes had to demonstrate that a notice of claims had already been served.  But there is no evidence from the pleadings or the record that Mr. Holmes did so.  The time to file a

late notice has also passed, so Mr. Holmes cannot remedy the error.  Mr. Holmes's state law tort claims are barred.

### H.  Additional Discovery

Mr. Holmes argues that he needs more discovery to pursue his claims.  Affidavit of Charles Holmes ("Holmes Aff.") ¶ 23, Dkt. No. 97.  After a review of the docket and relevant case history, the Court disagrees.

Although he does not cite any rule, Mr. Holmes appears to oppose the motion under Fed. R. Civ. P. 56(d).  A District Court is "obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery."  Dowling v. City of Phila., 855 F.2d 136, 139 (3d Cir. 1988) (internal citation omitted).  Rule 56(d) sets forth the procedure when a party alleges that it does not possess facts necessary to oppose the motion:

> (d) If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>> (1) defer considering the motion or deny it;
>> (2) allow time to obtain affidavits or declarations or to take discovery; or
>> (3) issue any other appropriate order.

A party who seeks to avoid entry of summary judgment under Rule 56(d) "must move beyond mere generalities and specify what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained."  Scott v. Graphic Commc'ns Int'l Union, Local 97-B, 92 Fed. App'x 896, 900 (3d Cir. 2004).

Here, Mr. Holmes identifies six types of discovery that he purportedly needs to adequately respond to Defendants' motion.  He claims that Defendants not provide sufficient information about (1) the transfers and who authorized them; (2) the employees who previously held the positions to which Mr. Holmes was transferred; (3) all other transfers of NPS employees from

2008 to 2013; (4) any investigations of Mr. Holmes related to his filing EEOC and PERC claims; (5) communications between all NPS employees about Mr. Holmes; and (6) any other charges of discrimination against NPS by other NPS employees.  See Holmes Aff. ¶¶ 9, 11-14, 16-17, 22, 25-35.  He also argues that he was never permitted to search Defendants' computer systems for electronically stored information, so he does not know if Defendants destroyed any relevant documents.  Id. ¶¶ 12-13.  Due to this lack of information, he asserts that could not adequately prepare to depose any Defendants.  Id. ¶ 22.  He contends that he raised these issues to the Court during discovery, but his concerns were not sufficiently addressed.[10]  See, e.g., id. ¶ 10.

Mr. Holmes does not satisfy Rule 56(d).  First, many of his requests for information are too vague and generalized.  For example, he requests access to Defendants' entire computer system (including backup systems and tapes) to search for relevant documents, but he does not explain why such wholesale access is necessary; he requests the appointment of a forensic specialist and a court-appointed master to ensure Defendants have not destroyed evidence, but he provides no specific reason to believe that spoliation occurred.

Second, for any specific discovery, he does not explain how the requested information would alter the outcome of the summary judgment motion.  Mr. Holmes has not provided any reasonable basis to believe that access to these files will uncover inculpatory evidence.  The Court will not permit Rule 56(d) to be used to engage in a fishing expedition.  Even if information was found that showed discriminatory animus, he would still not prevail because he has failed to show an adverse employment action under Title VII or NJLAD or any actionable harm under the First Amendment.

---

[10] Due to the age of the case, several magistrate judges were assigned to this matter at different times to oversee discovery.  Mr. Holmes only appears to discuss issues that arose when the Hon. James B. Clark, III was assigned the case.

Third, Mr. Holmes' reasons for not obtaining the desired discovery earlier are unpersuasive.  In essence, Mr. Holmes argues that opposing counsel convoluted the discovery process and the Court treated him unfairly.  Neither argument has merit.

Discovery will not be reopened under Rule 56(d) "if the purported inadequacy of the record is attributable to the movant's own failure to take advantage of the discovery period, rather than the other party's lack of cooperation."  Bates v. Tandy Corp., 186 F. App'x 288, 291 (3d Cir. 2006).  Here, it is attributable to Mr. Holmes.  In a March 2014 letter to the Court, Mr. Holmes explained that he did not receive certain discovery responses that he served on Defendants before the case was removed.  Letter dated March 13, 2014, Dkt. No. 35.  The Court therefore amended the scheduling order and granted Plaintiff leave to serve 15 new interrogatories and 25 new requests for document production to replace the discovery requests propounded in state court and extended the discovery end date by 90 days.  Order dated March 17, 2014 ¶¶ 5-7, 13, Dkt. No. 36.  Mr. Holmes submitted the additional requests, and Defendants produced several hundred pages of discovery.  See Letter dated May 14, 2014, Dkt. No. 40.

Mr. Holmes filed a formal motion to compel discovery.  Dkt. No. 46.  However, the Court directed Mr. Holmes to refile the motion and "to be as specific as possible in describing the discovery sought, his response to any objects stated by Defendants, and the reasons he believes he is entitled to discovery."  Order dated Aug. 13, 2014, Dkt. No. 47.  He did not file a supplemental motion.

The Court then granted Mr. Holmes more time to respond and to have counsel enter an appearance on his behalf.  Dkt. Nos. 51-52.  When he repeatedly failed to appear for depositions, failed to obtain counsel, and failed to provide certain discovery, the Court then entered an order to show cause why the case should not be dismissed.  Order to Show Cause dated Sept. 12, 2014,

Dkt. No. 53.   In response, Mr. Holmes accused the Court of bias, suggested the Court "discriminated against Plaintiff on account of race, ethnicity, sex, or other legally protected attribute," and requested the Magistrate Judge recuse himself.  Pl.'s Memorandum at 8-12, Dkt. No. 58.  The Court denied the motion to recuse but permitted discovery to continue.  Ltr. Order dated Oct. 15, 2014, Dkt. No. 60.  The Court also denied Mr. Holmes' motion to compel.  Ltr. Order dated Nov. 24, 2014, Dkt. No. 64.

 After the parties met and conferred again, Defendants provided Mr. Holmes with supplemental interrogatory responses.  Letter dated Jan. 9, 2015, Dkt. No. 99-3.  The Court denied Mr. Holmes' request for additional ESI beyond that provided by Defendants, but extended the discovery deadline a second time to permit Mr. Holmes to depose Defendants.  Dkt. Nos. 73, 74.  The Court then extended fact discovery a third time to May 29, 2015.  Dkt. No. 79.

Plaintiff never scheduled the depositions.  He also failed to appear for a telephonic statute conference and filed a second motion to recuse the Magistrate Judge, which was terminated as moot because a new Magistrate Judge was assigned to the matter.  Dkt. Nos. 80, 82, 83.  After the close of fact discovery, and seven months after Defendants submitted their supplemental interrogatory responses, Mr. Holmes challenged the sufficiency of the responses.  Status Report dated July 20, 2015, Dkt. No. 85.

As this record makes apparent, Mr. Holmes failed to take advantage of the discovery period.  He failed to schedule any depositions of the Defendants, even though the Court extended the discovery period three times for that purpose; he pursued recusal of the Magistrate Judge after the motion was originally denied; he failed to appear for status conferences; and he waited several months after the close of discovery before raising issues with sufficiency of Defendants' supplemental responses.   These issues were not the result of Defendants' conduct or the

29

Magistrate Judge's management of the discovery process.  Mr. Holmes' request for additional discovery is denied.

**IV.**   **CONCLUSION**

For the reasons set forth herein, Defendants' motion for summary judgment, Dkt. No. 93, is **GRANTED**.

**Dated: May 23, 2016**

*/s Madeline Cox Arleo*
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**